United States Court of Appeals,

Eleventh Circuit.

No. 97-6643.

William O'Neal WHITT, Jr., Plaintiff-Appellant,

v.

SHERMAN INT'L CORP., et al., Defendants-Appellees.

July 30, 1998.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-96-L-1974-S), Seybourn H. Lynne, Judge.

Before CARNES and MARCUS, Circuit Judges, and MILLS[*], Senior District Judge.

MARCUS, Circuit Judge:

This appeal raises issues involving the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, and state contract and tort law. Upon termination of his employment with defendant-appellees Sherman International Corporation and Constar, Inc. (collectively, "Sherman"), plaintiff-appellant William O'Neal Whitt, Jr. sought benefits in state court for which he had allegedly contracted with Sherman. Sherman removed the case to federal court, alleging that Whitt's state law claims were preempted by ERISA, and thus, federal question jurisdiction existed. The district court agreed with Sherman. Consequently, it denied Whitt's motion for remand to state court and entered summary judgment for Sherman. Because we conclude that no ERISA "plan" existed at the time of Whitt's termination, we hold that Whitt's state causes of action are not preempted by ERISA. Accordingly, we VACATE the district court's order granting

[*]Honorable Richard Mills, Senior U.S. District Judge for the Central District of Illinois, sitting by designation.

summary judgment and REMAND to the district court with instructions to REMAND this case to state court.

I.

A detailed recitation of the facts is necessary to understand our holding. Whitt served as a Group Vice President and General Counsel to Sherman from February 1984 until November 2, 1995, when Sherman involuntarily terminated his employment. Whitt also sat as a member of Sherman's Board of Directors from 1978 until mid-1994. In May 1988 Sherman and Whitt entered into a non-qualified stock option agreement and cash right agreement (collectively, "1988 Stock Option Agreement"). At that time, Constar was a minority shareholder of Sherman. In 1991, in connection with Constar's acquisition of a large portion of the stock of Sherman as a part of the financial restructuring of Sherman, Whitt signed an agreement he drafted dated September 10, 1991 ("1991 Release Agreement"), in which Whitt released his rights under the 1988 Stock Option Agreement in exchange for cash payments totaling $300,000 and a phantom stock plan or similar plan to be developed in the future. Phantom stock is "[a] right ... to receive an award with a value equal to the appreciation of a share of stock from the date the Phantom Stock is cashed out.... Phantom Stock programs are designed to provide executives with cash payments equivalent to amounts they could receive under an actual stock option or similar program.... Phantom programs are based on "phantom' or "hypothetical' shares or units." Coopers & Lybrand, *Executive Summary of Nonqualified Long-term Incentive Plans,* CV01 ALI-ABA 619, 632 (1996). Specifically, paragraph 4 of the 1991 Release Agreement states, "Sherman agrees that it will establish a Phantom Stock Plan, or similar plan, for the benefit of employees, said plan to be effective on or before January 1, 1992."

2

Work began on a phantom stock plan in 1992 or 1993. Various individuals created several draft proposals through July 22, 1994, but none garnered universal support. J. Thomas Holton, Chief Executive Officer and Chairman of the Board of Sherman, testified in deposition that, at that point, "[t]he whole issue just sort of, you know, went under study again, and just didn't surface. You know, it just became sort of a nonissue at that point." Nov. 20, 1996, Holton Dep. at 40. He further stated, "[I]t was in [Constar Chief Executive Officer O'Neill's] court to get it done." Meanwhile, O'Neill stated that after July of 1993, the implementation of the plan, other than an equity contribution issue, "was left to Mr. Holton." Around August 1995, Whitt directly asked O'Neill when Sherman would finally establish the promised plan. According to Whitt, O'Neill told him "it was not going to be done, that I had [a] plan and it was my job, that I ought to be happy about it, and that we were just not going to do it."

On November 2, 1995, Sherman terminated Whitt's employment by letter that same day. Among other things, the letter provided, "Upon the close of the 1995 fiscal year and receipt of the audited financial statements, payment, if any, due you under the "Sherman Long-Term Incentive Plan for Senior Executives, Effective January 1, 1992' will be paid to you in accordance with the provisions of that plan...." Holton testified that as of the time he fired Whitt in November 1995, he did not know what the terms of the 1992 LTIP named in the termination letter would be. Frank Anderson, President and Chief Executive Officer of Sherman and a party to the 1991 agreements, agreed, stating that he only first learned that a plan had been adopted in approximately October 1996, that he did not become aware of the actual terms of the plan until the week of November 22, 1996, and that he did not know how many drafts existed or which of the various, competing drafts would be adopted by Sherman prior to mid-November 1996. William Hamilton, Chief Financial

Officer of Sherman, also testified in deposition that he did not learn of the terms of the plan until November 18, 1996. He further testified that he did not place the plan on Sherman's books before this lawsuit was filed or this case removed because "you have to have a plan before you can book a liability. I mean there was no plan, so you have no basis to book a liability."

In early 1996, Sherman engaged KPMG Peat Marwick to perform the accounting work necessary to calculate the benefits due Whitt under the plan. Holton testified that Whitt did not receive his payment before filing this lawsuit because KPMG Peat Marwick had not completed the accounting work.

Subsequently, on September 17, 1996, Sherman's Board of Directors adopted the 1992 Long Term Incentive Plan for Senior Executives of Sherman ("1992 LTIP"), making the effective date of the plan January 1, 1992, in accordance with the terms of the 1991 Release Agreement. Whitt's benefits accrued as of the effective date of the 1992 LTIP. After Sherman adopted the 1992 LTIP, Sherman made a filing regarding the plan under 29 CFR § 2520.104-23 with the Department of Labor. On September 26, 1996, Sherman issued and mailed to Whitt a check in the amount of $9,412.16, which represented the amount due under the first of the ten annual installments called for by the LTIP, plus interest calculated pursuant to the terms of the Plan. Whitt refused to accept the check and returned it to Sherman.

On June 25, 1996, Whitt instituted this lawsuit in the Circuit Court of Jefferson County, Alabama. The complaint alleged causes of action for breach of contract, fraud, and interference. On July 30, 1996, Sherman filed a notice of removal to the United States District Court for the Northern District of Alabama, Southern Division, claiming ERISA super-preemption. Sherman then moved to dismiss, arguing ERISA "defensive preemption." On August 29, 1996, Whitt moved to

4

remand the case to state court for lack of subject matter jurisdiction and improper removal, claiming that his state claims were not preempted because Sherman neither established nor promised to establish an ERISA plan. Thereafter, on October 7, 1996, the district court denied Whitt's motion to remand. The same day, the district court granted Sherman's motion to dismiss, allowing Whitt thirty days to amend the complaint to state a claim under ERISA. On November 4, 1996, Whitt filed an amended complaint naming as defendants Sherman, Constar, 1988 ERISA Plan, 1991 ERISA Plan, 1996 ERISA Plan, and Amalgamated ERISA Plan. The complaint expressly stated that in filing the amended complaint, Whitt did not waive his "previously asserted claims that the suit was not properly removed, does not arise under ERISA, or is properly in federal court."

On March 3, 1997, following discovery, Whitt filed a motion to reinstate the dismissed state law claims and to remand the case to the state court for lack of subject matter jurisdiction and improper removal. The same day, Sherman filed a motion for summary judgment alleging that Whitt's amended complaint failed to state a claim under ERISA. On May 23, 1996, the district court denied the motion to remand but certified the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Thus, on June 9, 1997, Whitt petitioned this Court for permission to take an appeal under 28 U.S.C. § 1292(b), but the Court denied the petition on July 7, 1997. The district court then lifted its stay of the proceedings and granted Sherman's motion for summary judgment. Whitt now appeals the denial of his motion for remand and the entry of summary judgment.

## II.

We review questions of jurisdiction *de novo. McKusick v. City of Melbourne,* 96 F.3d 478, 482 (11th Cir.1996) (citing *Lucero v. Operation Rescue,* 954 F.2d 624, 627 (11th Cir.1992)). In reviewing matters concerning removal and remand, our predecessor Court has noted that "it is

axiomatic that ambiguities are generally construed against removal."[1] *Butler v. Polk,* 592 F.2d 1293, 1296 (5th Cir.1979).

A defendant may remove a case to federal court only if the district court would have had jurisdiction over the case had the case been brought there originally. 28 U.S.C. § 1441. Federal district courts, of course, have original jurisdiction over diversity cases and matters arising under federal law. 28 U.S.C. §§ 1331, 1332. Because, in this case, there is no contention that diversity exists between the parties, federal jurisdiction must rest, if at all, on federal question jurisdiction. Under the "well-pleaded complaint" rule, a case does not arise under federal law unless a federal question is presented on the face of the plaintiff's complaint. *Kemp v. Int'l Business Machines Corp.,* 109 F.3d 708, 712 (11th Cir.1997) (citing *Franchise Tax Bd. v. Const. Laborers Vacation Trust,* 463 U.S. 1, 11, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). Because the well-pleaded complaint rule requires a federal question to appear on the face of the plaintiff's complaint, a defense presenting a federal question—even a valid one—cannot create removal jurisdiction. *Id.* (citing *Franchise Tax Bd.,* 463 U.S. at 25-28, 103 S.Ct. 2841). In this case, Whitt brought only state law claims, and Sherman removed the case to federal court on account of ERISA preemption, a federal law defense. Under the general terms of the well-pleaded complaint rule, therefore, the removal of this case to federal court was improper because the preemption defense was not presented on the face of the complaint. *See id.*

The doctrine of "complete preemption" or "super preemption," however, qualifies the general well-pleaded complaint rule. *Kemp,* 109 F.3d at 712. Where Congress preempts an area of

---

[1]Decisions issued by the old Fifth Circuit are binding as precedent on the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

law so completely that any complaint raising claims in that area is necessarily federal in character, super preemption applies, and federal jurisdiction exists, even if the face of the complaint does not plead federal claims. *Id.* (citing *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63-64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968))). Super preemption converts state law claims into federal claims for purposes of the well-pleaded complaint rule, allowing a defendant to remove the case to federal court. *Id.* As this Court has recognized, the Supreme Court has held that Congress created super preemption in ERISA, which provides the exclusive cause of action for the recovery of benefits governed by an ERISA plan. *Id.* (citing *Metropolitan Life,* 481 U.S. at 65-67, 107 S.Ct. 1542). State law claims that seek relief available under ERISA are recharacterized as ERISA claims and therefore arise under federal law. *Id.* (citing *Metropolitan Life,* 481 U.S. at 67, 107 S.Ct. 1542).

Thus, this Court has found that the jurisdictional issue in cases such as the one at hand is dependent upon whether the plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a). *Kemp,* 109 F.3d at 712. If so, the Court must recharacterize the plaintiff's claim as an ERISA claim, and removal jurisdiction exists. *Id.* Conversely, if the plaintiff is not seeking relief that is available under section 1132(a), no federal question jurisdiction exists. *Id.*

A.

Section 1132(a) provides, in relevant part, that a participant or beneficiary of a "plan" may bring suit "to recover benefits due to him under the terms of his plan...." 29 U.S.C. § 1132(a)(1)(B). As used in ERISA, the term "plan" means an "employee welfare benefit plan" or an "employee pension benefit plan." *See* 29 U.S.C. § 1002(3). Thus, our central inquiry is to determine whether

7

the 1992 LTIP constituted an ERISA "plan" as of the time Whitt filed suit. This Court has adopted a "flexible analysis" for determining whether an ERISA "plan" is established, *Williams v. Wright,* 927 F.2d 1540, 1543 (11th Cir.1991), finding the existence of such plans where, "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (en banc) (citation omitted).

In *Williams,* for example, a retiring general manager brought an action against his employer, alleging violations of ERISA. The employer had sent Williams, the employee, a letter that provided, among other benefits, for Williams to receive $500 on the first of each month. After approximately three years of providing Williams with these benefits, the employer ceased. This Court concluded that the letter created a "plan" under ERISA, because it met the requirements outlined in *Donovan.* Specifically, we found that the employer's general assets provided the required source of financing. In so holding, we noted that, with some exceptions, the assets of employee benefit plans are required to be held in trust. Nonetheless, we concluded that "[a]n employer ... should not be able to evade the requirements of the statute merely by paying ... benefits out of general assets." *Id.* at 1544. Thus, we found that the payment of benefits out of an employer's general assets does not affect the threshold question of ERISA coverage. Second, we determined that the plan had sufficiently ascertainable procedures for receiving benefits: on the first of each month, the employer would send Williams a check for $500. Although we noted that the procedure was "simple," we nonetheless found it sufficient under the *Donovan* test. Third, although *Donovan* refers to an ascertainable "class of beneficiaries," we stated, "[W]e do not interpret Donovan's use of the word "class' as an absolute requirement of more than one beneficiary or that a plan tailored to the needs of a single employee

8

can not be within ERISA." *Williams,* 927 F.2d at 1545. Thus, we concluded that an ascertainable beneficiary existed. The analysis assumed that the benefits were reasonably ascertainable. Accordingly, we found that the letter constituted an ERISA "plan."

Both parties claim that *Williams* mandates a decision by this Court in their favor. Sherman argues that the instant case involves more documentation and a more readily ascertainable plan than *Williams.* In support of this contention, Sherman claims that whereas in *Williams,* the Court found a plan where only a letter existed, in this case, the Court can look to both the November 2, 1995 termination letter promising benefits under the 1992 LTIP and "a draft plan" of the LTIP to determine the plan. Whitt argues, however, that unlike in *Williams,* at the time Whitt was fired, neither the benefits intended nor the procedure for receiving those benefits could be determined from the letter and the 1992 LTIP draft because no one knew which, if any, of the several LTIP drafts containing various proposed benefits and procedures for delivering them would ultimately be adopted. While Sherman suggests that it was understood which particular draft of the 1992 LTIP governed at the time plaintiff-appellant's employment was terminated, Sherman cites nothing to support this proposition. Moreover, the record reflects that even the president and other officers of Sherman did not know at the time that Whitt was fired what, if any, plan would be adopted as the 1992 LTIP. Thus, under this Court's *Donovan* analysis, no ERISA "plan" existed at the time that Whitt was fired. As this Court has stated, "[I]t is the reality of a plan, fund or program and not the decision to extend certain benefits that is determinative." *Donovan,* 688 F.2d at 1373.

This conclusion is bolstered by an additional point. Although we have previously noted that "ERISA does not ... require a formal, written plan," *Donovan,* 688 F.2d at 1372, the Supreme Court has recently stated,

9

... ERISA already *has* an elaborate scheme in place for enabling beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents.

The basis of that scheme is another of ERISA's core functional requirements, that "[e]very employee benefits plan shall be established and maintained *pursuant to a written instrument.*"... In the words of the key congressional report, "[a] written plan is to be required in order that every employee may, *on examining the plan documents,* determine exactly what his rights and obligations are under the plan." ...

*Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 82-83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (emphasis in original) (quoting 29 U.S.C. § 1102(a)(1) (emphasis added) & H.R.Rep. No. 93-1280, p. 297 (1974), *reprinted in* U.S.Code Cong. & Admin. News ¶ . 4639, 5077, 5078 (emphasis added)). The Supreme Court's emphasis in *Schoonejongen* on the importance of a *written* plan presents yet another reason why on this record we are not prepared to find the existence of an ERISA plan. Here, Sherman had either numerous conflicting draft plans or, at best, a single *draft* plan that was still subject to change. Thus, upon examining the so-called "plan," an employee could not hope to "determine exactly what his rights and obligations [were] under the plan,[ ]" as they were subject to change upon adoption of the final version. Consequently, no ERISA "plan" existed at the time of Whitt's removal. Finally, although not dispositive of the issue, we note that Sherman never made an ERISA filing with the federal government in connection with the 1992 LTIP until after Whitt was fired.

B.

Sherman therefore argues alternatively that the 1992 LTIP had a retroactive effective date of January 1, 1992. The gist of Sherman's argument in this regard is first, that the 1992 LTIP as it currently stands no doubt constitutes an ERISA "plan," and second, that pursuant to the 1991 Agreement, which Whitt drafted, the parties agreed to give the plan ultimately adopted as the 1992

LTIP retroactive effect to January 1, 1992. Sherman further contends that retroactive ERISA plans are permissible and effective in preempting state claims. In support of this contention, Sherman cites to our decision in *Dyce v. Salaried Employees' Pension Plan of Allied Corp.,* 15 F.3d 163 (11th Cir.1994). We are not persuaded.

In *Dyce,* Ignition Products, a wholly owned subsidiary of Allied-Signal Corporation, maintained an ERISA pension plan for its employees which, among other benefits, provided that employees who elected to take early retirement from Allied would be eligible for and receive certain pension benefits. Before the group of plaintiff employees retired, the formerly Allied-owned Ignition was merged into Unison Industries, and Allied transferred all of its shares in Ignition to Unison. All of the plaintiffs continued their employment without interruption. As part of the deal, the ERISA pension plan was amended eight months after the change in ownership and retroactive to the date of change in ownership to provide that employees eligible to retire as of the date of the merger, but who elected to continue employment with Unison, would be eligible for plan benefits as of the date they terminated their employment with Unison, rather than the date they terminated their employment with Ignition. The plaintiff group of employees, who had worked for Ignition when it was owned by Allied and had continued to work for Unison after Unison purchased Ignition, sought to receive early retirement benefits from Allied under the original ERISA plan, although they were still employed by Ignition, now owned by Unison. Essentially, they contended that the merger had resulted in the employees' departure from Allied, thus triggering benefits under the plan. Pursuant to the amendment, the company rejected the plaintiffs' claims. The plaintiff employees contended that the retroactive change to the ERISA plan was improper. Finding that Unison had effectively stepped into the shoes of Allied, we upheld the retroactive change because the

regulations interpreting ERISA specifically provide that a modification or amendment of a pension plan may be retroactively applied under certain applicable circumstances, and the employees had not experienced a loss or change in benefits. Just as they were to be able to receive early retirement benefits upon electing to leave Allied, they would receive the same benefits upon electing to leave Unison. We further noted that the plaintiffs had not "elected" to leave Allied. Rather, Ignition had been purchased by Unison, and the employees went with the company. Had the employees exercised their rights to leave Allied before the transfer, Unison may have chosen not to rehire them.

Sherman attempts to liken *Dyce* to this case, arguing that Whitt contends that prior to Sherman's late 1996 adoption of the 1992 LTIP, Sherman had no ERISA plan. Thus, Sherman suggests, whatever the 1992 LTIP provided had to have increased the benefits available to Whitt before its retroactive enactment. Since there was no decrease in benefits from the prior situation (no ERISA plan), Sherman reasons, under *Dyce,* retroactive application of the 1992 LTIP is permitted.

Substantial problems with Sherman's analysis exist. First, the right to remove is generally tested at the time of the filing for removal. *See* Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d, § 3739. Sherman filed its notice of removal on July 30, 1996, notably, some six weeks *before* it adopted the 1992 LTIP on September 17, 1996. Because the 1992 LTIP had not been enacted as of the time of removal, for purposes of determining federal jurisdiction, no ERISA "plan" existed when Sherman removed the case, and, consequently, no federal question jurisdiction existed, either. Second, we find the instant case to be distinguishable in significant ways from *Dyce.* The retroactive *Dyce* amendment amounted to nothing more than a technical change to a plan already in existence. None of the benefit terms changed at all, so the employees could review the old plan and know what their benefits would be

12

under the new plan. Thus, the retroactive *Dyce* amendment did not conflict with ERISA's "elaborate scheme in place for enabling beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents." *Schoonejongen,* 514 U.S. at 82-83, 115 S.Ct. 1223 (1995).

Here, however, there was no previously existing plan to amend. Rather, Sherman subsequently adopted one of several new "plan" proposals from among a gaggle of drafts. Consequently, during Whitt's employment with Sherman, it is undeniable that there was no plan to examine, and Whitt had no way to " "determine exactly what his rights and obligations [were] under the plan.' " *Schoonejongen,* 514 U.S. at 82-83, 115 S.Ct. 1223 (1995) ( quoting H.R.Rep. No. 93-1280, p. 297 (1974), *reprinted in* U.S.Code Cong. & Admin. News ¶ . 4639, 5077, 5078 (emphasis added)). Our research has revealed no case where an entirely new plan, as opposed to an amendment to an existing plan, has been retroactively applied, and, under the facts of this case, we decline to adopt such an approach here.

Nor, as Sherman suggests, does the legislative history demand a different result. Relying on isolated Supreme Court statements referring to congressional intent behind ERISA, Sherman argues that ERISA requires us to find preemption in this case. Not one of the cases Sherman cites, however, so much as implies that preemption would be appropriate under the facts of this case.

In *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), for example, Dedeaux was injured in an employment-related accident and filed a disability claim with Pilot Life, the provider and partial administrator of Dedeaux's employer's long-term disability employee benefit plan. When Dedeaux's ERISA plan disability benefits were terminated by Pilot Life, Dedeaux instituted a diversity suit against the company and alleged tortious breach of contract,

13

breach of fiduciary duties, and fraud in the inducement. Pilot Life argued that Dedeaux's state law claims were preempted by ERISA, and the Supreme Court agreed, finding that Dedeaux's common law causes of action, "each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption...." *Pilot Life,* 481 U.S. at 48, 107 S.Ct. 1549. Unlike the case at hand, *Pilot Life* involved no question of whether an ERISA "plan" existed and no retroactivity issue. Consequently, it is not instructive on the issue at hand.

Similarly, in *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), an employee brought a state law action against his employer and alleged that the employer had wrongfully terminated him to avoid contributing to, or paying benefits under, the employee's pension plan (ERISA plan). Again, the Supreme Court found that the employee's claim was preempted under ERISA because "in order to prevail, [the] plaintiff must plead, and the court must find, that an ERISA plan exists and the employer has a pension-defeating motive in terminating the employment." *Id.* at 140, 111 S.Ct. 478. Once again, as in *Pilot Life,* neither the existence of an ERISA "plan" nor the need to apply an ERISA "plan" retroactively were in issue. Thus, also like *Pilot Life,* we do not find this case helpful in resolving the current situation.

We do find relevant, however, the recent sea change in courts' willingness to apply the preemption doctrine expansively. As we recently observed, in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the Supreme Court has begun "essentially [to] turn[ ] the tide on the expansion of the preemption doctrine[.]" *Morstein v. National Insurance Services, Inc.,* 93 F.3d 715, 721 (11th Cir.1996) (en banc). Particularly in view of this Court's preference for remand where federal jurisdiction is not absolutely clear, *Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir.1994),

14

we decline Sherman's invitation to set sail on the uncharted waters of retroactive application of entirely new ERISA "plans."

III.

Because we conclude that no ERISA plan existed at the time of removal, and further, that retroactive application of the subsequently adopted ERISA plan would be inappropriate in this case, the preemption doctrine does not apply, federal jurisdiction cannot be found, and the district court's entry of summary judgment was a nullity. Accordingly, we VACATE the district court's order granting summary judgment and REMAND to the district court with instructions to REMAND this case to state court.